UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:11-cv-00528-MSS-EAJ

| | |
|---|---|
| JAMES DIZOGLIO and<br>SVETLANA SAVACENCO, his wife | ) <br>) <br>) |
| Plaintiffs, | ) <br>) |
| v. | ) <br>) |
| EDWARD T. CROISSANT, individually,<br>MICHAEL HARRELL, individually,<br>and the CITY OF TAMPA, a Florida<br>Municipal corporation, | ) <br>) <br>) <br>) <br>) |
| Defendants. | ) <br>) |

## SECOND AMENDED COMPLAINT AND
## DEMAND FOR JURY TRIAL

1.    This is a civil action by Plaintiff JAMES DIZOGLIO and Plaintiff SVETLANA SAVACENCO seeking money damages in excess of $15,000 dollars, exclusive of costs, interest, and attorney's fees, against Defendant EDWARD T. CROISSANT, individually, MICHAEL HARRELL, individually, and Defendant CITY OF TAMPA, a Florida Municipal corporation.

2.    This action is brought pursuant to 42 U.S.C. § 1983 and § 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.  The United States District Court for the Southern District of Florida has jurisdiction of this action under 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.  Plaintiff JAMES DIZOGLIO and Plaintiff SVETLANA SAVACENCO further invoke the supplemental jurisdiction of the United States District Court to hear pendant State tort claims arising under State law, pursuant to 28 U.S.C. § 1367(a).

3.      Plaintiff JAMES DIZOGLIO and Plaintiff SVETLANA SAVACENCO have served notice of claim upon Pam Iorio, as Mayor, City of Tampa, Florida, in accordance with the provisions of § 768.28 of the Florida Statutes.

## PARTIES

4.      Plaintiff JAMES DIZOGLIO [hereinafter Plaintiff DIZOGLIO] or DIZOGLIO is a resident of the State of New Hampshire, and the husband of Plaintiff SVETLANA SAVACENCO.

5.      Plaintiff SVETLANA SAVACENCO [hereinafter Plaintiff SAVACENCO or SAVACENCO] is a resident of the State of New Hampshire, and the wife of Plaintiff JAMES DIZOGLIO.

6.      At all times referred to herein, Defendant EDWARD T. CROISSANT [hereinafter  CROISSANT or Defendant CROISSANT] was a police officer for the CITY OF TAMPA, a Florida Municipal corporation, and was acting under color of law, and in such capacity as an agent, servant, and employee of Defendant CITY OF TAMPA, Florida.

7.      At all times referred to herein, Defendant MICHAEL HARRELL [hereinafter HARRELL or Defendant HARRELL] was a police officer for the CITY OF TAMPA, a Florida Municipal corporation, and was acting under color of law, and in such capacity as an agent, servant, and employee of Defendant CITY OF TAMPA, Florida.

8.      Defendant CITY OF TAMPA [hereinafter Defendant CITY OF TAMPA or Defendant CITY] is a Florida municipal corporation, organized and existing under the laws of the State of Florida, and located in Hillsborough County, Florida.  In this cause, the CITY acted through its agents, employees, and servants, including Defendant CROISSANT, Defendant HARRELL, and

2

others.

9.      Plaintiff JAMES DIZOGLIO and Plaintiff SVETLANA SAVACENCO sue Defendant CROISSANT and Defendant HARRELL in their individual capacities.

## FACTS

10.      At all times material hereto, Plaintiff DIZOGLIO was a professional ticket broker.

11.      As a professional ticket broker, Plaintiff DIZOGLIO worked events ranging from The Masters golf tournament, to NASCAR, to the Super Bowl.

12.      On February 1, 2009, Plaintiff DIZOGLIO was in Tampa, Hillsborough County, Florida, to work Super Bowl XLIII between the Pittsburgh Steelers and Arizona Cardinals.

13.      At all times material hereto, Plaintiff DIZOGLIO was accompanied by his wife, Plaintiff SAVACENCO.

14.      While in Tampa, Florida, Plaintiff DIZOGLIO acquired Super Bowl tickets from a routine and regular source with access to Super Bowl tickets, and from whom Plaintiff DIZOGLIO had previously obtained tickets for customers for past Super Bowls.

15.      At all times material hereto, the Super Bowl XLIII tickets acquired by Plaintiff DIZOGLIO had all of the security countermeasures imbedded in Super Bowl XLIII tickets, including several covert security countermeasures not disclosed to the public.   In addition to raised lettering and a water mark on the back of the ticket which appears under ultra violet light, the tickets in Plaintiff DIZOGLIO's possession contained the following security countermeasures:

a).      The letters and numbers for "Super Bowl XLIII" are laser-cut out the ticket so light passes directly through the lettering and words "Super Bowl XLIII."

3

In other words, words "Super Bowl XLIII" is not printed on the ticket, but is cut out of the ticket;

b).    On the reverse side of the ticket, there is a colored hologram in the upper left corner; based on the angle the ticket is held, the hologram either displays the words "Tampa Bay" or the logo for Super Bowl XLIII, or a multi-colored "wave," but not all at the same time;

c).    At the bottom of the back of the ticket, there is a picture of the stadium and field; the thermachromic inc for the field is heat sensitive and turns a deeper shade of green when a finger is held down over the field. When the finger is removed and the heat source dissipates, the field returns to a lighter shade of green.

16.    Based on the deposition testimony on January 5, 2012 of Joseph Hummel (hereinafter "Hummel"), Director of Investigative Services for the National Football League (hereinafter "NFL"), the tickets for Super Bowl XLIII were designed and produced by the NFL in conjunction with Weldon, Williams & Lick, Inc., an Arkansas based-company specializing in the design and production of tickets, badges, credentials, and like materials, including the security countermeasures contained therein.

17.    Hummel testified that in preparation for Super Bowl XLIII, New York-based attorney Nikki Hart, Esq. (hereinafter "Hart") then-associate counsel for the NFL, provided a briefing to law enforcement officials at the Florida Department of Law Enforcement (hereinafter "FDLE"), in Tampa, concerning both the overt and covert security countermeasures included in the tickets for Super Bowl XLIII, as referenced herein.

4

18.     Hummel testified that each of the overt security countermeasures could be counterfeited as some level, but there has never been a successful effort to counterfeit the security countermeasures with the same degree of quality and sophistication as the security countermeasures contained in the legitimate Super Bowl tickets produced by Weldon, Williams & Lick, Inc.

19.     In addition to the foregoing, Weldon, Williams & Lick, Inc., provided to the NFL fifteen (15) so-called ticket readers which operated in a similar manner to airport boarding-pass (or "check-in") Kiosks, whereby a credit card is swiped thru an automated reader.  (Other automated systems exist in most retail establishments that accept credit cards, whereby credit or debit cards are "swiped" thru a reader).

20.     The fifteen (15) ticket readers were provided to Defendant CITY OF TAMPA and/or other law enforcement agencies and security officials.

21.     Hummel testified that the ticket readers were used to identify a security countermeasure located on the tickets for Super Bowl XLIII.

22.     According to Hummel, if a legitimate Super Bowl ticket was passed thru the "ticket reader," a green light would activate on the "ticket reader."  If the correct security feature(s) were not identified by the "ticket reader," a red light would activate.

23.     Hummel testified there has never been any instance where a ticket reader failed to correctly identify a legitimate Super Bowl ticket, although there have been instances where more than one "swipe" was required for the ticket reader to pick up the necessary security countermeasures on the ticket.

24.     In preparation for Super Bowl XLIII, a counterfeiting task force was established, consisting of personnel from Defendant CITY OF TAMPA's police department, as well

as members of the Hillsborough County Sheriff's Office, and agents from the United States Immigration and Customs Enforcement (ICE).

25.     Sergeant William Todd (hereinafter "Todd") was the highest-ranking hands-on employee of Defendant CITY OF TAMPA assigned to the counterfeiting task force. Todd was personally responsible for selecting and supervising the approximately 12-15 employees of Defendant CITY OF TAMPA's police department who worked on the counterfeiting task force.

26.     In preparation for Super Bowl XLIII, Todd met with Hummel at the Marriott Waterside, in Tampa, Florida.

27.     At that meeting, Todd took possession of the ticket readers supplied by Hummel, and was provided instruction by Hummel on the use of the ticket readers.

28.     In preparation for the Super Bowl, Todd attended Hart's briefing at FDLE, in Tampa.

29.     In preparation for Super Bowl XLIII, Todd selected Defendant HARRELL to work on the counterfeiting task force. At all times material hereto, Todd also supervised Defendant HARRELL on a day-to-day basis as a member of Todd's squad at Defendant CITY OF TAMPA's police department.

30.     At the briefing provided by Hart, the overt and covert security countermeasures imbedded in Super Bowl XLIII tickets were disclosed to the members of the counterfeiting task force in attendance, including Todd and Defendant HARRELL (each of whom personally attended the briefing).

31.     Defendant HARRELL also spoke with Wayne Grooms (hereinafter "Grooms"), who according to Defendant HARRELL "was actually a licensed private investigator

6

in North Carolina, but he did a tremendous amount of work for the NFL and other corporations.  So

when he came to town, he was in charge of, for lack of a better term, the security and task forces out

there specifically relating to counterfeiting."

32.     In sworn deposition testimony on January 25, 2012, Defendant HARRELL

explained that

> Mr. Grooms showed me the tickets, and he showed me some of the outward security
> features; such as, I believe on the back of the ticket there was a place you could press
> your thumb or a finger and the ink would change a color.  And then on the hologram,
> it was specifically designed so if you turned it one way I think it said Tampa or
> Tampa Stadium or something, and the other way it would either say NFL or Super
> Bowl. . . . . And also, there was some laser cutting of that, of the word Super Bowl,
> and the Super Bowl numbers, the Roman numerals.

33.     Grooms further advised Defendant HARRELL that "the laser cutting was

basically a very straight-edged cut.  There would be no perforation in it."

34.     Following the briefing at FDLE, Todd provided a briefing to members of his

counterfeiting task force in the parking lot at FDLE, including Defendant HARRELL.

35.     At the briefing in the parking lot at FDLE, Todd further discussed the covert

security countermeasures imbedded in Super Bowl XLIII, and based on the information provided by

Hummel, provided instruction and training to the members of his counterfeiting task force on the

proper use of the ticket readers.

36.     At the meeting, Defendant HARRELL was provided with a ticket reader by

Todd.

37.     Todd testified that the NFL provided the counterfeiting task force with

information relating to the overt and covert security countermeasures contained in the tickets for

Super Bowl XLIII to assist members of the task force in determining whether Super Bowl XLIII

7

tickets were counterfeit.

38.     At all times material hereto, Defendant CROISSANT was a member of Defendant CITY OF TAMPA's bike patrol, and was not a member of the counterfeiting task force. As a consequence,  Defendant CROISSANT did not attend the briefing provided by Hart at FDLE, or the follow-up briefing provided by Todd.

39.     At all times material hereto, it was Todd's expectation that his subordinates, including HARRELL, would use all the investigative tools and training available to them when determining whether Super Bowl XLIII tickets were, or were not, counterfeit, including the overt and covert security countermeasures imbedded in the tickets for Super Bowl XLIII, and the ticket readers provided by Hummel.

40.     At all times material hereto, it was Todd's understanding that his subordinates, including HARRELL, knew that as members of the counterfeiting task force, they possessed specialized  information and training not available to other employees of Defendant CITY OF TAMPA's police department.

41.     Todd testified that it was very clear to members of the counterfeiting task force, including Defendant HARRELL, that it was their responsibility and obligation to examine Super Bowl XLIII tickets in their totality, including all overt and covert security countermeasures, in addition to using the ticket reader, before concluding that a Super Bowl XLIII ticket was counterfeit or authentic.

42.     According to Todd, if questions arose concerning whether a Super Bowl XLIII ticket was counterfeit or authentic, it was the responsibility of his subordinates, including Defendant HARRELL, to conduct a reasonable investigation, including but not limited to contacting Todd (if

clarification was needed).

43.     At all times material hereto, both Todd and Hummel were on location at the Super Bowl, as well as representatives from NFL properties, and Grooms, the anti-counterfeiting expert retained by the NFL– each of whom Todd had the ability to contact via his police radio or cellular phone.

44.     At all times material hereto, Plaintiff DIZOGLIO had multiple offers from prospective buyers to purchase the Super Bowl tickets, and verbally agreed to sell three (3) Super Bowl XLIII tickets to Pittsburgh attorneys Phillip DiLucente, Esq. and Jason C. Tetlow, Esq, of DiLucente & Tetlow, LLC, as well as third person, Justin Casciola (hereinafter DiLucente, Tetlow, and Casciola), for a total of $7,200.   The seats were located directly behind the Pittsburgh Steelers' bench and therefore highly desirable to Pittsburgh Steelers' fans.

45.     Plaintiff DIZOGLIO traveled to the area of Raymond James Stadium in his motor vehicle, with Plaintiff SAVACENCO, DiLucente, Tetlow, and Casciola traveling as passengers.

46.     Near the stadium, Plaintiff DIZOGLIO parked his motor vehicle and exited, along with DiLucente, Tetlow, and Casciolaa, while Plaintiff SAVACENCO remained inside the parked motor vehicle.

47.     As Plaintiff DIZOGLIO was speaking with DiLucente, Tetlow, and Casciola (who were trying unsuccessfully to negotiate a lower price), Defendant CROISSANT arrived on a police bicycle and asked Plaintiff DIZOGLIO "what he was doing," or words to that affect.

48.     At all times material hereto, Defendant CROISSANT was dressed in a Defendant CITY OF TAMPA police uniform, in a manner consistent with a police officer assigned

9

to bicycle patrol duties.

49.     Plaintiff DIZOGLIO explained to Defendant CROISSANT that he drove his customers to the stadium and was in the process of selling his customers Super Bowl tickets and walking his customers to the gate.

50.     Defendant CROISSANT asked where Plaintiff DIZOGLIO obtained the Super Bowl tickets, at which time Plaintiff DIZOGLIO explained that he was a licensed ticket broker and obtained the Super Bowl tickets from a trusted source.

51.     At all times material hereto, Plaintiff DIZOGLIO wore a lanyard around his neck with clear plastic card holders displaying all necessary municipal and county licenses for the occupation of ticket peddler.

52.     Defendant CROISSANT demanded to see the tickets in Plaintiff DIZOGLIO's possession, without a warrant, or probable cause and exigent circumstances.

53.     Plaintiff DIZOGLIO submitted to Defendant CROISSANT's show of authority, and surrendered his tickets to Defendant CROISSANT, as directed.

54.     Defendant CROISSANT asked Plaintiff DIZOGLIO how he knew the tickets were real, at which time Plaintiff DIZOGLIO explained that the tickets contained several anti-counterfeiting measures.

55.     Plaintiff DIZOGLIO proceeded to explain to Defendant CROISSANT that the tickets were made of high quality material with the letters and numbers for "Super Bowl XLIII" laser-cut out the ticket.

56.     Plaintiff DIZOGLIO further explained to Defendant CROISSANT that there was a sophisticated hologram on the back of the ticket, as well as a stadium printed on the back of

10

the ticket with a playing field made from heat sensitive thermal inc that changed colors.

57.    Plaintiff DIZOGLIO further explained to Defendant CROISSANT that there was a watermark on the back of the ticket which only appeared under ultra-violent light.  Plaintiff DIZOGLIO added that he worked in the ticket broker industry for several years and brokered tickets at numerous Super Bowls, and the tickets were obviously legitimate Super Bowl tickets.

58.    Plaintiff DIZOGLIO then displayed his business license to Defendant CROISSANT, and explained that he was licensed in several jurisdictions.  Defendant CROISSANT responded that the licenses "didn't mean anything" because anybody could obtain a license.

59.    Plaintiff DIZOGLIO responded that he would be personally escorting his customers directly to the gate and that Defendant CROISSANT was welcome to himself escort Plaintiff DIZOGIO and his customers to the gate, at which time Defendant CROISSANT would see for himself that the tickets were valid and DiLucente, Tetlow, and Casciola would be admitted into the stadium.

60.    At all times material hereto, Defendant CROISSANT was aware of the overt security countermeasures imbedded in the 2009 Super Bowl tickets, insofar as the overt security countermeasures were publicly advertised by the NFL in an effort to protect consumers against counterfeiting.  However, Defendant CROISSANT received no formal training concerning either the overt or covert security countermeasures.

61.    Notwithstanding Plaintiff DIZOGLIO's efforts to assist Defendant CROISSANT with his understanding of the overt and covert security countermeasures imbedded in the Super Bowl tickets, Defendant CROISSANT advised Plaintiff DIZOGLIO that he did not believe the tickets were real.

11

62.     At all times material hereto, the Super Bowl tickets in the possession of Plaintiff DIZOGLIO contained each of the overt and covert security countermeasures imbedded in the tickets designed Weldon, Williams & Lick, Inc., which have never been successfully counterfeited with the same quality and sophistication as the security countermeasures contained in legitimate Super Bowl tickets, such that no reasonably well trained police officer in the position of Defendant CROISSANT could have reasonably believed the tickets in the possession of Plaintiff DIZOGLIO were counterfeit.

63.     Defendant CROISSANT then approached Plaintiff DIZOGLIO and stood extremely close to Plaintiff DIZOGLIO'S face, and in a harsh tone, stated: "You stay here and don't move," whereupon Defendant CROISSANT left on his bicycle as other officers began to arrive at the location of Plaintiff DIZOGLIO's motor vehicle.

64.     At all times material hereto, Defendant CROISSANT had been instructed to "call for a scanner" (i.e., ticket reader) if he suspected Super Bowl XLIII tickets were counterfeit.

65.     Defendant CROISSANT thereafter left the area on his bicycle, and traveled to the location of Defendant HARRELL, whereupon Defendant CROISSANT presented Plaintiff DIZOGLIO's Super Bowl XLIII tickets to Defendant HARRELL.

66.     In sworn deposition testimony on January 24, 2012, Defendant CROISSANT testified: "I called for who had this scanner box.  The people with the scanner boxes were - - supposedly that was their whole job to determine the validity of tickets."

67.     At CROSSANT's request, Defendant HARRELL swiped each of Plaintiff's Super Bowl tickets with the ticket reader provided by Todd, in the same manner as a credit card.

68.     According to Defendant CROISSANT, Defendant HARRELL scanned each

12

of Plaintiff's Super Bowl tickets with the ticket reader "just one time" and advised CROISSANT the tickets were not coming up as authentic, or were "not good."

69.     According to Defendant CROUISSANT, Defendant HARRELL made no further examination of the tickets, and simply returned the tickets to Defendant CROISSANT.

70.     At all times material hereto, Defendant HARRELL knew each of Defendant CITY OF TAMPA police officers selected by Todd to work on the counterfeiting task force.

71.     At all times material hereto, Defendant HARRELL knew that Defendant CROISSANT was not a member of the counterfeiting task force and was not present at Hart's briefing at FDLE.

72.     At all times material hereto, Defendant HARRELL knew that Defendant CROISSANT was not present when Defendant HARRELL was briefed by Grooms on the covert and overt security countermeasures contained in the tickets for Super Bowl XLIII.

73.     At all times material hereto, Defendant HARRELL knew that Defendant CROISSANT was not present at the briefing conducted by Todd concerning the use of the ticket reader or the overt and covert security countermeasures imbedded in the Super Bowl XLIII tickets.

74.     At all times material hereto, each of the Super Bowl XLIII tickets provided by Defendant CROISSANT to Defendant HARRELL contained all the correct overt and covert security countermeasures.

75.     At all times material hereto, any reasonable police officer in the position of Defendant HARRELL would have immediately recognized that the Super Bowl XLIII tickets provided by Defendant CROISSANT to Defendant HARRELL contained all the correct overt and covert security countermeasures.

76.     At deposition on January 25, 2012, Defendant HARRELL testified:

Q:     Did you examine the tickets provided to you by Officer Croissant?

A:     As far as I recall, I just pulled them through the scanner in his presence.

Q:     Did you make . . . any efforts to, based on your training, look at the tickets to ascertain whether the features . . . were correct or not correct?

A:     Yeah.   I do remember that the laser cutting appeared to be correct, and I do - - I believe I looked at the hologram and found it to be what I believe was correct.

Q:     Did you use the termographic ink feature to determine if it was correct?

A:     I don't recall.

Q:     Was there anything on the tickets that you observed that appear[ed] to not be correct?

A:     Not that I recall.

* * *

Because we had such a backlog of calls, all I was doing was providing the scanner services at that point.   It was up to them to determine what type of case they had, or did not have, based on their circumstances.

Q:     Did you understand that individuals who provided you these tickets would be relying upon your work with the scanner with regards to their investigation of potentially counterfeit ticket cases?

A:     Well, it would be part of their decision-making process.

Q:     Were you ever aware through any source that the ticket reader would be the single authoritative holy grail of determining whether people did or did not get arrested for counterfeit tickets?

A:     No, and as I mentioned earlier, I don't even recall that those scanners were numbered, so it could be determined who had which scanner, so at that point it was a tool.

14

Q:     Was it your understanding that the scanners would be used as one tool amongst others, which based on the totality of the circumstances would be used to ascertain whether tickets were or were not valid Super bowl tickets.

A:     Yes.  It was to be the scanner's job was to pick up or not pick up the hidden security features that nobody knew about, and that was the only thing that scanner could or could not do.  So in my understanding, is that that was going to be one of the tools that would be used to determine if a ticket was, in fact, valid.

Q:     Did you, based upon your use of the scanner, ever indicate to any of your colleagues in law enforcement what your personal opinion was with regards to whether a ticket you scanned was or was not counterfeit, as opposed to indicating whether or not the reader picked up the security feature.

A:     All I would tell them is, is all I had here is a red light and a green light.  I have no way of knowing what that margin of error might be, but if I get a red light it's supposed to be counterfeit, and if I get a green light it's supposed to be good. . . .

77.     At all times material hereto, the Super Bowl tickets in the possession of Plaintiff DIZOGLIO and provided to Defendant HARRELL contained all the correct overt and covert security countermeasures imbedded in the tickets designed Weldon, Williams & Lick, Inc., and no reasonably well trained police officer in the position of Defendant HARRELL could have reasonably believed the tickets provided to Defendant HARRELL were counterfeit.

78.     After providing the Super Bowl tickets to Defendant HARRELL for examination, Defendant CROISSANT returned on his bicycle to the location of Plaintiff DIZOGLIO and Plaintiff SAVACENCO.

79.     As Defendant CROISSANT approached, he held out his arms and crossed his wrists (i.e., as symbol for handcuffing), whereupon both  Plaintiff DIZOGLIO and Plaintiff SAVACENCO were arrested in the absence of probable cause that either Plaintiff DIZOGLIO or Plaintiff SAVACENCO committed any criminal offense.

80.     Defendant CROISSANT handcuffed Plaintiff DIZOGLIO while a second officer handcuffed Defendant SAVACENCO at the request of Defendant CROISSANT.

81.     According to Defendant CROISSANT, Plaintiff DIZOGLIO "was still adamant that the tickets were genuine."

82.     At all times material hereto, Plaintiff SAVACENCO was merely present and said nothing.

83.     At all times material hereto, Plaintiff DIZOGLIO's conduct was lawful, but even if it were not, it was clearly established law that Plaintiff SAVACENCO's mere presence at the scene of suspected illegal activity was insufficient to establish probable cause for arrest where there existed no other factors indicating her involvement in the questioned activity. *U.S. v. Ashcroft*, 607 F.2d 1167, 1172 (5th Cir. 1979), citing *United States v. Di Re*, 68 S.Ct. 222, 227 (1948) (possession of counterfeit gasoline ration coupons by co-occupant of motor vehicle insufficient to establish probable cause for arrest). Similarly, it was clearly established law that "[m]ere presence is insufficient to establish knowing participation in a conspiracy, United States v. Rozen, 600 F.3d 494, 497 (5th Cir. 1979), as is mere association with conspirators." United States v. Sullivan, 763 F.2d 1215, 1218 (11th Cir.1985).

84.     During a search of Plaintiff DIZOGLIO motor vehicle, a large black-in-color SUV with dark tinted windows arrived on scene. Based on information and belief, the operator of the SUV was a supervisory official assigned to the multi-agency task force providing security at Super Bowl XLIII.

85.     The operator of the SUV exited and examined Plaintiff DIZOGLIO's tickets, whereupon the operator of the vehicle immediately and without hesitation informed Defendant

16

CROISSANT: "These are real tickets, what are you doing?"

86.     Defendant CROISSANT nevertheless completed the arrest of Plaintiff DIZOGLIO and Plaintiff SAVACENCO, whereupon Plaintiff DIZOGLIO and Plaintiff SAVACENCO were transported to a police paddy wagon, and subsequently transferred to the Hillsborough County Jail for incarceration.

87.     In support of the arrests, Defendant CROISSANT completed police reports for submission to prosecuting authorities alleging that "the tickets were verified counterfeit by TPD Officer Harrell," notwithstanding that any reasonable police officer in the position of Defendant CROISSANT would have known the Super Bowl tickets were not counterfeit, and in fact Defendant CROISSANT had been cautioned by at least one supervisory official that the Super Bowl tickets were not counterfeit, but nevertheless completed the arrests of Plaintiff DIZOGLIO and Plaintiff SAVACENCO and instituted criminal proceedings against them.

88.     Some time after the Super Bowl, Todd examined the Super Bowl tickets obtained from Plaintiff DIZOGLIO.

89.     According to Todd, "I looked at the tickets and said that I thought they were real," and "that the security features that I was familiar with were present on the tickets and they appeared to be authentic."

90.     Todd alleges that he ran the tickets through one of the ticket readers supplied by the NFL "more than once."

91.     Todd further alleges he obtained "[m]ixed results.  One time they would say counterfeit and one time they would say true."

92.     According to Todd, this was the only instance where any ticket scanned at the

17

Super Bowl in 2009 yielded inconsistent results.

93.     According to Defendant HARRELL, Todd "scanned them and I scanned them multiple times," and "we did not get consistent light reads, and . . . it seemed to be varied on the speed at which the ticket was pulled through the machine. If you went to slow, it gave a red light. If you went too fast, it gave you a red light.   So we discovered that somewhere in the middle the speed would produce a green light with those tickets."

94.     On the other hand, during his deposition on January 25, 2012, Todd denied that the speed that the ticket was swiped caused the ticket scanner to produce a green light or red light.   Todd testified:

> Q:      Do you have any knowledge as to whether the speed with which he [Defendant HARRELL] swiped the tickets had an impact on the ability of the reader to correctly identify the ticket as being valid?

> A:      No, sir.

95.     Notwithstanding the allegedly inconsistent results obtained by Todd during his testing of Plaintiff DIZOGLIO's Super Bowl tickets, Todd made no official report of his findings. Todd further made no record of which ticket reader was used to conduct the test, or speed at which the ticket was swiped through the ticket reader, or the number of times each Super Bowl ticket was tested.  Nor did Todd record how many times each of Plaintiff DIZOGLIO's tickets were tested, or the specific results of each test.  Finally, Todd failed to disclose his findings to the NFL.

96.     According to Todd, the testing of Plaintiff DIZOGLIO's Super Bowl tickets was the only instance where any ticket scanned at the Super Bowl in 2009 yielded an inconsistent result on any ticket reader(s).

97.     Following the arrest, Defendant CROISSANT completed a police report

alleging that Plaintiff DIZOGLIO and Plaintiff SAVACENCO "conspired" to "sell three counterfeit NFL Super Bowl ticket to the victims in exchange for $7,800.00. The tickets were "verified counterfeit by TPD Ofc. Harrell."

98.     But for the conduct of Defendant HARRELL, as set forth herein, Defendant CROISSANT would not have arrested either Plaintiff DIZOGLIO or Plaintiff SAVACENCO. Defendant CROISSANT testified:

> Q:     Did you contact anybody during the entire enforcement action at the Super Bowl on February 1st, 2009, for assistance with regards to whether the tickets were or were not counterfeit, aside from Officer Harrell?

> A:     No, I did not.

> Q:     Why not?

> A:     Why? There was no reason to. I had my suspicions about the tickets when I first saw them. They had the box. The box was supposedly accurate. I mean, that's what they told us, you scan them and the scanner tells you if they're fake or not. And then that verified my suspicions and showed that they were fake and that was my probable cause to make the arrest.

99.     Insofar as each of the Super Bowl tickets in the possession of Plaintiff DIZOGLIO were true and lawful Super Bowl XLIII tickets, and no criminal charges were ever filed against either Plaintiff DIZOGLIO or Plaintiff SAVACENCO.

100.    In his sworn deposition on January 24, 2012, Defendant CROISSANT admitted that if the tickets in the possession of Plaintiff DIZOGLIO were counterfeit, they were "extremely high quality."

101.    Defendant CROISSANT further testified:

> Q:     Do you have any knowledge or information that would demonstrate that Mr. DiZoglio affirmatively knew at the time of this incident that the tickets in his possession that he was trying to sell were, in fact, counterfeit, given the high

19

quality of the security features that we've discussed and his lack of a scanner?

A:     Based on what you - - based on how you just worded the question, then no.

Q:     So at least with regards to Mr. DiZoglio and Ms. Savacenco, you're not able then nor now to exclude the possibility that they legitimately believed in their own heart that the tickets were valid based upon the quality of the tickets or the quality of the counterfeits, as you believed them to be, at the time of the incident. Fair?

A:     That's a fair assumption.

Q:     Is it a crime in the State of Florida to possess a counterfeit Super Bowl ticket?

A:     To merely possess?   Without looking at the statue and looking at the exact elements, I would venture to say that, no, to merely possess.

102.     According to Defendant HARRELL, the last time he spoke with Defendant CROISSANT was at an in-service training session approximately two (2) years ago, but he never discussed this litigation with Defendant CROISSANT.

103.     According to Defendant CROISSANT, he spoke with Defendant HARRELL subsequent to the filing of this lawsuit and advised him that "his name should be next to mine" as a defendant in this litigation.   In response, Defendant CROISSANT laughed.

104.     At all times material hereto, the conduct of Defendant CROISSANT and Defendant HARRELL occurred under color of state law.

## CAUSES OF ACTION

## COUNT I
## PLAINTIFF, JAMES DIZOGLIO'S, CONSTITUTIONAL CLAIMS
## AGAINST DEFENDANT CROISSANT, INDIVIDUALLY,
## COGNIZABLE UNDER 42 U.S.C. § 1983
(SEIZURE OF PROPERTY)

For his cause of action against Defendant CROISSANT, individually, in Count I, Plaintiff DIZOGLIO states:

105.    Plaintiff DIZOGLIO realleges and adopts, as if fully set forth in Count I, the allegations of paragraphs 1 through 104.

106.    As Plaintiff DIZOGLIO was completing the negotiations for the sale of his Super Bowl tickets to DiLucente, Tetlow, and Casciola, Defendant CROISSANT demanded to see the tickets without a warrant, or probable cause and exigent circumstances.

107.    Plaintiff DIZOGLIO submitted to Defendant CROISSANT's show of authority and surrendered his tickets to Defendant CROISSANT, whereupon Defendant CROISSANT left the area on his bicycle, in possession of Plaintiff DIZOGLIO's Super Bowl tickets, without Plaintiff DIZOGLIO's consent.

108.    The conduct of Defendant CROISSANT constitutes a seizure of Plaintiff DIZOGLIO's Super Bowl tickets, and prevented Plaintiff DIZOGLIO from completing the sale of the Super Bowl tickets to DiLucente, Tetlow, and Casciola, and/or others.

109.    At all times material hereto, it was clearly established law that the due process clause of the Fourteenth Amendment requires that a private citizen be given notice and an opportunity to be heard before a government official seizures his property. *Quik Cash Pawn & Jewelry, Inc. v. Sheriff of Broward County*, 279 F.3d 1316, 1322 (11th Cir. 2002).

110.    No reasonable officer in the position of Defendant CROISSANT could have believed there existed probable cause and exigent circumstances for the warrantless seizure of Plaintiff DIZOGLIO's Super Bowl tickets.  The warrantless seizure of Plaintiff DIZOGLIO's Super Bowl tickets without notice and opportunity to be heard was objectively unreasonable under the

circumstances, and constitutes a violation of Plaintiff DIZOGLIO's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

111.    As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff DIZOGLIO suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

112.    As a further direct and proximate result of the conduct of Defendant CROISSANT, individually, Plaintiff DIZOGLIO suffered mental anguish and loss of capacity for the enjoyment of life.  Plaintiff DIZOGLIO also lost profits from the sale of his Super Bowl tickets. The losses are either permanent or continuing and Plaintiff DIZOGLIO will suffer the losses in the future, in violation of Plaintiff DIZOGLIO's  civil rights.  Plaintiff DIZOGLIO has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff DIZOGLIO prays:

a.    Judgment for compensatory damages in excess of $ 15,000 dollars;

b.    Judgment for exemplary damages;

c.    Cost of suit;

d.    Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

e.    Trial by jury as to all issues so triable; and

f.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT II
## PLAINTIFF, JAMES DIZOGLIO'S, FOURTH AMENDMENT CLAIM
## AGAINST DEFENDANT CROISSANT, INDIVIDUALLY,

## COGNIZABLE UNDER 42 U.S.C. § 1983
### (TEMPORARY DETENTION)

For his cause of action against Defendant CROISSANT, individually, in Count II, Plaintiff DIZOGLIO states:

113.    Plaintiff DIZOGLIO realleges and adopts, as if fully set forth in Count II, the allegations of paragraphs 1 through 104.

114.    While in possession of Plaintiff DIZOGLIO's Super Bowl tickets, Defendant CROISSANT approached Plaintiff DIZOGLIO and stood extremely close to Plaintiff DIZOGLIO'S face, and in a harsh tone, stated: "You stay here and don't move," whereupon Defendant CROISSANT left on his bicycle as other officers began to arrive at the location of Plaintiff DIZOGLIO's motor vehicle.

115.    As a result of the conduct of Defendant CROISSANT, no reasonable person in the position of Plaintiff DIZOGLIO would have believed they were free to leave.

116.    The temporary detention of Plaintiff DIZOGLIO by Defendant CROISSANT occurred in the absence of reasonable suspicion that Plaintiff DIZOGLIO had committed, was committing, or was about to commit any offense.

117.    The temporary detention of Plaintiff DIZOGLIO by Defendant CROISSANT was objectively unreasonable, in violation of Plaintiff DIZOGLIO's clearly established rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983, to be free from temporary detention in the absence of reasonable suspicion that Plaintiff DIZOGLIO had committed, was committing, or was about to commit any offense.

118.    As a direct and proximate result of the acts described above, in violation of

42 U.S.C. § 1983, Plaintiff DIZOGLIO suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

119.   As a further direct and proximate result of the conduct of Defendant CROISSANT, individually, Plaintiff DIZOGLIO suffered loss of his liberty and freedom, mental anguish, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing and Plaintiff DIZOGLIO will suffer the losses in the future, in violation of Plaintiff DIZOGLIO's civil rights.  Plaintiff DIZOGLIO has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff DIZOGLIO prays:

a.   Judgment for compensatory damages in excess of $ 15,000 dollars;

b.   Judgment for exemplary damages;

c.   Cost of suit;

d.   Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

e.   Trial by jury as to all issues so triable; and

f.   Such other relief as this Honorable Court may deem just and appropriate.

## COUNT III
## PLAINTIFF, JAMES DIZOGLIO'S, FALSE ARREST/FALSE IMPRISONMENT CLAIM AGAINST DEFENDANT CROISSANT, INDIVIDUALLY, COGNIZABLE, UNDER 42 U.S.C. § 1983

For his cause of action against Defendant CROISSANT, individually, in Count III, Plaintiff DIZOGLIO states:

24

120.    Plaintiff DIZOGLIO realleges and adopts, as if fully set forth in Count III, the allegations of paragraphs 1 through 104.

121.    Defendant CROISSANT proximately caused Plaintiff DIZOGLIO's arrest in the absence of probable cause that Plaintiff DIZOGLIO committed any criminal offense.

122.    The conduct of Defendant CROISSANT towards Plaintiff DIZOGLIO was objectively unreasonable and violated Plaintiff DIZOGLIO's clearly established rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 to be free from arrest and detention in the absence of probable cause.

123.    As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff DIZOGLIO suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

124.    As a further direct and proximate result of the conduct of Defendant CROISSANT, Plaintiff DIZOGLIO suffered loss of his liberty and freedom, mental anguish, and loss of capacity for the enjoyment of life.   Plaintiff DIZOGLIO was also required to retain the services of a criminal defense attorney, and to pay a reasonable fee for his services.   Plaintiff DIZOGLIO's losses are either permanent or continuing and Plaintiff DIZOGLIO will suffer the losses in the future, in violation of Plaintiff DIZOGLIO's civil rights.   Plaintiff DIZOGLIO has also agreed to pay the undersigned a reasonable fee for his services, herein.

WHEREFORE, Plaintiff DIZOGLIO prays:

a.    Judgment for compensatory damages in excess of $ 15,000 dollars;

b.    Judgment for exemplary damages;

c.      Cost of suit;

d.      Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

## COUNT IV
## PLAINTIFF, JAMES DIZOGLIO'S, FALSE ARREST/FALSE IMPRISONMENT CLAIM AGAINST DEFENDANT HARRELL, INDIVIDUALLY, COGNIZABLE, UNDER 42 U.S.C. § 1983

For his cause of action against Defendant HARRELL, individually, in Count IV, Plaintiff DIZOGLIO states:

125.    Plaintiff DIZOGLIO realleges and adopts, as if fully set forth in Count IV, the allegations of paragraphs 1 through 104.

126.    Defendant HARRELL, by direct act or indirect procurement, personally participated in or proximately caused the arrest of Plaintiff DIZOGLIO in the absence of probable cause.

127.    Defendant HARRELL falsely advised Defendant CROISSANT that each of the four (4) Super Bowl tickets seized from Plaintiff DIZOGLIO were counterfeit under circumstances were Defendant HARRELL knew as a member of the counterfeiting task force that members of Defendant CITY OF TAMPA's police department, including Defendant CROISSANT, were actively investigating and arresting any/all persons selling goods with counterfeit trade marks, including Super Bowl tickets.

128.    At all times material hereto, it was a foreseeable consequence of the conduct

of Defendant HARRELL that Defendant CROISSANT would rely upon the information provided by Defendant HARRELL to support his determination that the four (4) Super Bowl tickets seized from Plaintiff DIZOGLIO were counterfeit. *Jackson v. Sauls*, 206 F.3d 1156, 1168 n. 16 (11th Cir. 2000) ("An act or omission is a legal or proximate cause of a plaintiff's injuries or damages if it appears from the evidence that the injury or damage was a reasonably foreseeable consequence of the act or omission").

129.   The conduct of Defendant HARRELL towards Plaintiff DIZOGLIO was objectively unreasonable and violated Plaintiff DIZOGLIO's clearly established rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 to be free from arrest and detention in the absence of probable cause.

130.   As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff DIZOGLIO suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

131.   As a further direct and proximate result of the conduct of Defendant HARRELL, Plaintiff DIZOGLIO suffered loss of his liberty and freedom, mental anguish, and loss of capacity for the enjoyment of life.   Plaintiff DIZOGLIO was also required to retain the services of a criminal defense attorney, and to pay a reasonable fee for his services.   Plaintiff DIZOGLIO's losses are either permanent or continuing and Plaintiff DIZOGLIO will suffer the losses in the future, in violation of Plaintiff DIZOGLIO's civil rights.   Plaintiff DIZOGLIO has also agreed to pay the undersigned a reasonable fee for his services, herein.

WHEREFORE, Plaintiff DIZOGLIO prays:

27

a.     Judgment for compensatory damages in excess of $ 15,000 dollars;

b.     Judgment for exemplary damages;

c.     Cost of suit;

d.     Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

e.     Trial by jury as to all issues so triable; and

f.     Such other relief as this Honorable Court may deem just and

appropriate.

<strong><u>COUNT V</u></strong><br>
<strong><u>PLAINTIFF, SVETLANA SAVACENCO'S, FALSE ARREST/FALSE IMPRISONMENT</u></strong><br>
<strong><u>CLAIM AGAINST DEFENDANT CROISSANT, INDIVIDUALLY,</u></strong><br>
<strong><u>COGNIZABLE, UNDER 42 U.S.C. § 1983</u></strong>

For her cause of action against Defendant CROISSANT, individually, in Count V, Plaintiff SAVACENCO states:

132.     Plaintiff SAVACENCO realleges and adopts, as if fully set forth in Count V, the allegations of paragraphs 1 through 104.

133.     Defendant CROISSANT proximately caused Plaintiff SAVACENCO's arrest in the absence of probable cause that Plaintiff SAVACENCO committed any criminal offense.

134.     The conduct of Defendant CROISSANT towards Plaintiff SAVACENCO was objectively unreasonable and violated Plaintiff SAVACENCO's clearly established rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 to be free from arrest and detention in the absence of probable cause.

135.     As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff SAVACENCO suffered grievously, has been brought into public scandal,

and with great humiliation, mental suffering, and damaged reputation.

136.    As a further direct and proximate result of the conduct of Defendant CROISSANT, Plaintiff SAVACENCO suffered loss of her liberty and freedom,  mental anguish, and loss of capacity for the enjoyment of life.   Plaintiff SAVACENCO was also required to retain the services of a criminal defense attorney, and to pay a reasonable fee for his services.  Plaintiff SAVACENCO's  losses are either permanent or continuing and Plaintiff SAVACENCO will suffer the losses in the future, in violation of Plaintiff SAVACENCO's   civil rights.   Plaintiff SAVACENCO has also agreed to pay the undersigned a reasonable fee for her services, herein.

WHEREFORE, Plaintiff SAVACENCO prays:

a.    Judgment for compensatory damages in excess of $ 15,000 dollars;

b.    Judgment for exemplary damages;

c.    Cost of suit;

d.    Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

e.    Trial by jury as to all issues so triable; and

f.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT VI
## PLAINTIFF, JAMES DIZOGLIO'S, FALSE ARREST/FALSE IMPRISONMENT CLAIM AGAINST DEFENDANT CITY OF TAMPA

For his cause of action against Defendant CITY OF TAMPA in Count VI Plaintiff DIZOGLIO states:

137.    Plaintiff DIZOGLIO realleges and adopts, as if fully set forth in Count VI, the allegations of paragraphs 1 through 104.

29

138. The actions of Defendant CROISSANT and/or Defendant HARRELL, in causing the arrest of Plaintiff DIZOGLIO in the absence of probable cause, were taken in the absence of lawful authority. The actions of Defendant CROISSANT and/or Defendant HARRELL constitute false arrest/false imprisonment of Plaintiff DIZOGLIO under Florida law.

139. The false arrest/false imprisonment of Plaintiff DIZOGLIO by Defendant CROISSANT and/or Defendant HARRELL was committed by Defendant CROISSANT and/or Defendant HARRELL in the course and scope of their employment as a police officers for Defendant CITY OF TAMPA.

140. As a direct and proximate result of the acts described above, Plaintiff DIZOGLIO suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

141. As a further direct and proximate result of the conduct of Defendant CITY OF TAMPA, Plaintiff DIZOGLIO suffered loss of his liberty and freedom, mental anguish, and loss of capacity for the enjoyment of life. Plaintiff DIZOGLIO was also required to retain the services of a criminal defense attorney, and to pay a reasonable fee for his services. The losses are either permanent or continuing and Plaintiff DIZOGLIO will suffer the losses in the future, in violation of Plaintiff DIZOGLIO's rights.

WHEREFORE, Plaintiff DIZOGLIO prays:

a. Judgment for compensatory damages in excess of $ 15,000 dollars;

b. Cost of suit;

c. Trial by jury as to all issues so triable; and

d. Such other relief as this Honorable Court may deem just and

appropriate.

## COUNT VII
## PLAINTIFF, SVETLANA SAVACENCO'S, FALSE ARREST/FALSE IMPRISONMENT CLAIM AGAINST DEFENDANT CITY OF TAMPA

For her cause of action against Defendant CITY OF TAMPA in Count VII, Plaintiff SAVACENCO states:

142.    Plaintiff SAVACENCO realleges and adopts, as if fully set forth in Count VII, the allegations of paragraphs 1 through 104.

143.    The actions of Defendant CROISSANT, in causing the arrest of Plaintiff SAVACENCO in the absence of probable cause, were taken in the absence of lawful authority.  The actions of Defendant CROISSANT constitute false arrest/false imprisonment of Plaintiff SAVACENCO under Florida law.

144.    The false arrest/false imprisonment of Plaintiff SAVACENCO by Defendant CROISSANT was committed by Defendant CROISSANT in the course and scope of his employment as a police officer for Defendant CITY OF TAMPA.

145.    As a direct and proximate result of the acts described above, Plaintiff SAVACENCO suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation.

146.    As a further direct and proximate result of the conduct of Defendant CITY OF TAMPA, Plaintiff SAVACENCO suffered loss of her liberty and freedom, mental anguish, and loss of capacity for the enjoyment of life.    Plaintiff SAVACENCO was also required to retain the services of a criminal defense attorney, and to pay a reasonable fee for his services.   The losses are either permanent or continuing and Plaintiff SAVACENCO will suffer the losses in the future, in

31

violation of Plaintiff SAVACENCO's rights.

WHEREFORE, Plaintiff SAVACENCO prays:

        a.      Judgment for compensatory damages in excess of $ 15,000 dollars;

        b.      Cost of suit;

        c.      Trial by jury as to all issues so triable; and

        d.      Such other relief as this Honorable Court may deem just and appropriate.

**COUNT VIII**
**PLAINTIFF, JAMES DIZOGLIO'S, FALSE ARREST/FALSE IMPRISONMENT**
**CLAIM AGAINST DEFENDANT CROISSANT, INDIVIDUALLY**

For his cause of action against Defendant CROISSANT, individually, in Count VIII, Plaintiff DIZOGLIO states:

147.    Plaintiff DIZOGLIO realleges and adopts, as if fully set forth in Count VIII, the allegations of paragraphs 1 through 104.

148.    Defendant CROISSANT, by direct act or indirect procurement, personally participated in or proximately caused the arrest of Plaintiff DIZOGLIO in the absence of probable cause.

149.    The actions of Defendant CROISSANT, in causing the arrest of Plaintiff DIZOGLIO in the absence of probable cause, were taken in absence of lawful authority.  The actions of Defendant CROISSANT constitute false arrest/false imprisonment of Plaintiff DIZOGLIO under Florida law.

150.    Alternatively to the allegations set forth in Count VI, if the false arrest/false imprisonment of Plaintiff DIZOGLIO was not committed by Defendant CROISSANT during the

32

course and scope of his employment for Defendant CITY OF TAMPA, or was committed by Defendant CROISSANT in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, the false arrest/false imprisonment of Plaintiff DIZOGLIO was committed by Defendant CROISSANT in his individual capacity.

151. As a direct and proximate result of the acts described above, Plaintiff DIZOGLIO suffered grievously and has been brought into public scandal, with great humiliation, mental suffering and damaged reputation, including business reputation/goodwill.

152. As a further direct and proximate result of the conduct of Defendant CROISSANT, individually, Plaintiff DIZOGLIO suffered loss of his liberty and freedom, mental anguish, and loss of capacity for the enjoyment of life.  Plaintiff DIZOGLIO was also required to retain the services of a criminal defense attorney, and to pay a reasonable fee for his services. Plaintiff DIZOGLIO's losses are either permanent or continuing and Plaintiff DIZOGLIO will suffer the losses in the future, in violation of Plaintiff DIZOGLIO's rights.

WHEREFORE, Plaintiff DIZOGLIO prays:

a. Judgment for compensatory damages in excess of $ 15,000 dollars;

b. Judgment for exemplary damages;

c. Cost of suit;

d. Trial by jury as to all issues so triable; and

e. Such other relief as this Honorable Court may deem just and appropriate.

## COUNT IX
## PLAINTIFF, SVETLANA SAVACENCO'S, FALSE ARREST/FALSE IMPRISONMENT CLAIM AGAINST DEFENDANT CROISSANT, INDIVIDUALLY

For his cause of action against Defendant CROISSANT, individually, in Count IX, Plaintiff SAVACENCO states:

153.    Plaintiff SAVACENCO realleges and adopts, as if fully set forth in Count IX, the allegations of paragraphs 1 through 104.

154.    Defendant CROISSANT proximately caused Plaintiff SAVACENCO's arrest in the absence of probable cause that Plaintiff SAVACENCO committed any criminal offense.

155.    The actions of Defendant CROISSANT, in causing the arrest of Plaintiff SAVACENCO in the absence of probable cause, were taken in absence of lawful authority.  The actions of Defendant CROISSANT constitute false arrest/false imprisonment of Plaintiff SAVACENCO under Florida law.

156.    Alternatively to the allegations set forth in Count VII, if the false arrest/false imprisonment of Plaintiff SAVACENCO was not committed by Defendant CROISSANT during the course and scope of his employment for Defendant CITY OF TAMPA, or was committed by Defendant CROISSANT in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, the false arrest/false imprisonment of Plaintiff SAVACENCO was committed by Defendant CROISSANT in his individual capacity.

157.    As a direct and proximate result of the acts described above, Plaintiff SAVACENCO suffered grievously and has been brought into public scandal, with great humiliation, mental suffering and damaged reputation.

158.    As a further direct and proximate result of the conduct of Defendant CROISSANT, individually, Plaintiff SAVACENCO suffered loss of her liberty and freedom, mental anguish, and loss of capacity for the enjoyment of life.  Plaintiff SAVACENCO was also required

to retain the services of a criminal defense attorney, and to pay a reasonable fee for his services. Plaintiff SAVACENCO's losses are either permanent or continuing and Plaintiff SAVACENCO will suffer the losses in the future, in violation of Plaintiff SAVACENCO's rights.

WHEREFORE, Plaintiff SAVACENCO prays:

a.   Judgment for compensatory damages in excess of $ 15,000 dollars;

b.   Judgment for exemplary damages;

c.   Cost of suit;

d.   Trial by jury as to all issues so triable; and

e.   Such other relief as this Honorable Court may deem just and appropriate.

### COUNT X
### PLAINTIFF, JAMES DIZOGLIO'S, LOSS OF CONSORTIUM CLAIM
### AGAINST DEFENDANT CITY OF TAMPA

For his cause of action against Defendant CITY OF TAMPA, in Count X, Plaintiff DIZOGLIO states:

159.   Plaintiff DIZOGLIO realleges and adopts, as if fully set forth in Count X, the allegations of paragraphs 1 through 104.

160.   Defendant CROISSANT, by direct act or indirect procurement, personally participated in or proximately caused the arrest of Plaintiff SAVACENCO in the absence of probable cause.

161.   The actions of Defendant CROISSANT in causing the arrest of Plaintiff SAVACENCO in the absence of probable cause, were taken in absence of lawful authority.  The actions of Defendant CROISSANT constitute false arrest/false imprisonment of Plaintiff

SAVACENCO.

162.    The false arrest/false imprisonment of Plaintiff SAVACENCO by Defendant CROISSANT was committed by Defendant CROISSANT in the course and scope of his employment as a police officer for Defendant CITY OF TAMPA.

163.    As a direct and proximate result of the conduct of Defendant CITY OF TAMPA towards Plaintiff SAVACENCO, Plaintiff DIZOGLIO suffered grievously, and lost the companionship, cooperation, affection, solace, comfort, fellowship, society and assistance of Plaintiff SAVACENCO, his wife.

WHEREFORE, Plaintiff DIZOGLIO prays:

a.    Judgment for compensatory damages in excess of $ 15,000 dollars;

b.    Cost of suit;

c.    Trial by jury as to all issues so triable; and

d.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT XI
## PLAINTIFF, SVETLANA SAVACENCO'S, LOSS OF CONSORTIUM CLAIM AGAINST DEFENDANT CITY OF TAMPA

For her cause of action against Defendant CITY OF TAMPA, in Count XI, Plaintiff SAVACENCO states:

164.    Plaintiff SAVACENCO realleges and adopts, as if fully set forth in Count XI, the allegations of paragraphs 1 through 104.

165.    Defendant CROISSANT and/or Defendant HARRELL, by direct act or indirect procurement, personally participated in or proximately caused the arrest of Plaintiff

36

DIZOGLIO in the absence of probable cause.

166.    The actions of Defendant CROISSANT and/or Defendant HARRELL, in causing the arrest of Plaintiff DIZOGLIO in the absence of probable cause, were taken in absence of lawful authority.  The actions of Defendant CROISSANT and/or Defendant HARRELL constitute false arrest/false imprisonment of Plaintiff DIZOGLIO.

167.    The false arrest/false imprisonment of Plaintiff DIZOGLIO by Defendant CROISSANT and/or Defendant HARRELL was committed by Defendant CROISSANT and/or Defendant HARRELL in the course and scope of their employment as police officers for Defendant CITY OF TAMPA.

168.    As a direct and proximate result of the conduct of Defendant CITY OF TAMPA towards Plaintiff SAVACENCO, Plaintiff SAVACENCO suffered grievously, and lost the companionship, cooperation, affection, solace, comfort, fellowship, society and assistance of Plaintiff DIZOGLIO, her husband.

WHEREFORE, Plaintiff SAVACENCO prays:

    a.    Judgment for compensatory damages in excess of $ 15,000 dollars;

    b.    Cost of suit;

    c.    Trial by jury as to all issues so triable; and

    d.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT XII
## PLAINTIFF, JAMES DIZOGLIO'S, LOSS OF CONSORTIUM CLAIM
## AGAINST DEFENDANT CROISSANT, INDIVIDUALLY

For his cause of action against Defendant CROISSANT, individually, in Count XII, Plaintiff

DIZOGLIO states:

169.   Plaintiff DIZOGLIO realleges and adopts, as if fully set forth in Count XII, the allegations of paragraphs 1 through 104.

170.   Defendant CROISSANT, by direct act or indirect procurement, personally participated in or proximately caused the arrest of Plaintiff SAVACENCO in the absence of probable cause.

171.   The actions of Defendant CROISSANT, in causing the arrest of Plaintiff SAVACENCO in the absence of probable cause, were taken in absence of lawful authority.   The actions of Defendant CROISSANT constitute false arrest/false imprisonment of Plaintiff SAVACENCO.

172.   Alternatively to the allegations set forth in Count X, if the false arrest/false imprisonment of Plaintiff SAVACENCO was not committed by Defendant CROISSANT during the course and scope of his employment for Defendant CITY OF TAMPA, or was committed by Defendant CROISSANT in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, the false arrest/false imprisonment of Plaintiff SAVACENCO was committed by Defendant CROISSANT in his individual capacity.

173.   As a direct and proximate result of the conduct of Defendant CROISSANT, individually, towards Plaintiff SAVACENCO, Plaintiff DIZOGLIO suffered grievously, and lost the companionship, cooperation, affection, solace, comfort, fellowship, society and assistance of Plaintiff SAVACENCO, his wife.

WHEREFORE, Plaintiff DIZOGLIO prays:

a.   Judgment for compensatory damages in excess of $ 15,000 dollars;

b.      Judgment for exemplary damages;

c.      Cost of suit;

d.      Trial by jury as to all issues so triable; and

e.      Such other relief as this Honorable Court may deem just and appropriate.

## COUNT XIII
## PLAINTIFF, SVETLANA SAVACENCO'S, LOSS OF CONSORTIUM CLAIM AGAINST DEFENDANT CROISSANT, INDIVIDUALLY

For her cause of action against Defendant CROISSANT, individually, in Count XIII, Plaintiff SAVACENCO states:

174.    Plaintiff SAVACENCO realleges and adopts, as if fully set forth in Count XIII, the allegations of paragraphs 1 through 104.

175.    Defendant CROISSANT, by direct act or indirect procurement, personally participated in or proximately caused the arrest of Plaintiff DIZOGLIO in the absence of probable cause.

176.    The actions of Defendant CROISSANT, in causing the arrest of Plaintiff DIZOGLIO in the absence of probable cause, were taken in absence of lawful authority. The actions of Defendant CROISSANT constitute false arrest/false imprisonment of Plaintiff DIZOGLIO.

177.    Alternatively to the allegations set forth in Count XI, if the false arrest/false imprisonment of Plaintiff DIZOGLIO was not committed by Defendant CROISSANT during the course and scope of his employment for Defendant CITY OF TAMPA, or was committed by Defendant CROISSANT in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, the false arrest/false imprisonment of

39

Plaintiff DIZOGLIO was committed by Defendant CROISSANT in his individual capacity.

178.   As a direct and proximate result of the conduct of Defendant CROISSANT, individually, towards Plaintiff DIZOGLIO, Plaintiff SAVACENCO suffered grievously, and lost the companionship, cooperation, affection, solace, comfort, fellowship, society and assistance of Plaintiff DIZOGLIO, her husband.

WHEREFORE, Plaintiff DIZOGLIO prays:

a.   Judgment for compensatory damages in excess of $ 15,000 dollars;

b.   Judgment for exemplary damages;

c.   Cost of suit;

d.   Trial by jury as to all issues so triable; and

e.   Such other relief as this Honorable Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

179.   Plaintiff DIZOGLIO and Plaintiff SAVACENCO demand trial by jury on all issues so triable as of right.

DATED this  16th  day of February, 2012.

By:   s/. Hugh L. Koerner
Hugh L. Koerner
Florida Bar No.: 716952
Attorneys for Plaintiff
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Hollywood, FL 33021
Telephone:  (954) 522-1235
Facsimile:  (954) 522-1176
Email: hlklaw@hughkoerner.com
**Attorneys for Plaintiffs James Dizoglio and Svetlana Savacenco**

**CERTIFICATE OF SERVICE**
**Case No. 8:11-cv-00528-MSS-EAJ**

**I HEREBY CERTIFY** that this ___16th___ day of February, 2012, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system.

By: ___*s/. Hugh L. Koerner*_____
Hugh L. Koerner

41

## SERVICE LIST
## Case No. 8:11-cv-00528-MSS-EAJ

Ursula D. Richardson, Esquire
Florida Bar Number:  0064467
Assistant City Attorney
315 E. Kennedy Boulevard, 5th Floor
Tampa, FL 33602
Telephone: (813) 274-7205
Facsimile:  (813) 274-8809
Email:  Ursula.Richardson@tampagov.net
**Attorneys for Attorney for Defendant, City of Tampa, Edward T. Croissant, individually, and the City of Tampa, a Florida Municipal Corporation**

Hugh L. Koerner, Esq.
Florida Bar No.: 716952
Attorney for Plaintiff
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Hollywood, FL 33021
Telephone:  (954) 522-1235
Facsimile:  (954) 522-1176
Email: hlklaw@hughkoerner.com
**Attorneys for Plaintiffs James DiZoglio and Svetlana Savacenco**